IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| EMMANUEL OLOLADE, § | | |
| TDCJ-CID # 1042126, § | | |
| § | | |
| Petitioner, § | | |
| § | | |
| v. § | | CIVIL ACTION H-04-2200 |
| § | | |
| DOUG DRETKE, § | | |
| § | | |
| Respondent. § | | |

**MEMORANDUM OPINION AND ORDER**

Emmanuel Ololade, a Texas prison inmate, has filed a petition for a writ of habeas corpus, under 28 U.S.C. § 2254, challenging a state court conviction and twenty-seven year sentence for theft. Respondent Doug Dretke has filed a Motion for Summary Judgment (Docket Entry No. 10) seeking dismissal of the petition. After considering the motion, Ololade's response, the record, and the applicable law, the court **GRANTS** the respondent's motion and **DISMISSES** the habeas petition. The reasons are stated below.

**I. Factual Background**

Ololade, a former employee of State of Texas Comptroller's Office, was charged with and convicted of defrauding the State of Texas. He and another individual named Olugbenga Adejoke stole the identities of about 100 individuals and submitted numerous fraudulent requests for fuel tax reimbursement from the Comptroller's Office. The crime entailed an elaborate scheme made possible in part by Ololade's position of trust as a public official. A summary of the facts detailing the offense and the lengthy investigation which led to the discovery of the offense are set forth in

the brief submitted by the State in *Ololade v. State*, No. 10-01-00255-CR (Tex. App.- Oct. 30, 2002, pet. ref'd) (unpublished):

> Monte Dunn, the corporate security manager for Washington Mutual Bank, testified that he is responsible for conducting fraud investigations for the bank. (RR IV 20-21). In July of 2000, someone in the bank's "bank by mail group"[Fn 1] contacted Dunn and informed him that the bank had received five applications for banking-by-mail accounts in Houston and each application bore a nearly identical address. (RR IV 21, 29). Each application was received for a different named individual but all the applications identified the applicants' address as 9707 Gessner and listed the same apartment number, 2116.[Fn 2] (RR IV 21, 24). The addresses varied only insofar as a different capitalized letter followed the apartment number for each address. (IV 21, 24-25). According to Dunn, this was a very unusual circumstance. (RR IV21, 25).
>
> [Fn 1. "Bank by mail" refers to a service under which a customer opens an account over the telephone by providing basis information. (RR IV 22). The customer then has 30 days within which to visit the bank and provide appropriate identification and sign a signature card. (RR IV 22). During the 30-day period, the account operates as a normal account, meaning the customer may make deposits and withdrawals. (RR IV 23).]
> [Fn 2. The applications were submitted under the following names: Bryant Caldwell, Timothy Duff, Donald Fehrenbach, Joseph Saranello, and Francisco Sarrazola. (RR IV 24).]
>
> Dunn looked up these five accounts on his computer and learned that there were small activities when these accounts were first opened and then there were large deposits which were immediately followed by single lump-sum withdrawals by check. (RR IV 25, 29). The deposits were made at Houston branches. (RR IV 29). Dunn explained that this account activity was unusual so he decided to further investigate the matter. (RR IV 25-26). Dunn obtained copies of the deposited items and learned that treasury warrants issued by the State Comptroller's Office had been deposited into these accounts. (RR IV 26-27). The warrants varied in amount from $30,000 to $70,000. (RR IV 27). Suspecting that the warrants might be counterfeit, Dunn contacted the State Comptroller's Office and learned that the warrants were authentic and that they were issued as gas tax refunds. (RR IV 27-28). Dunn also obtained copies of the withdrawals from these five accounts and learned that checks were written on each of these accounts made payable to Olugbenga Adejoke. (RR IV 30-31, 33). The checks were then deposited into an account in Adejoke's name at the Citizen's Bank of Houston. (RR IV 31).
>
> Finding it very suspicious that five different people from the same basic address would be involved in the gas business, Dunn continued his investigation. (RR IV 27-28). He contacted a member of the Criminal Investigation Division of the State Comptroller's Office who directed him to Billy Johnson, a Houston police officer

assigned to the United States Secret Service Task Force which investigates fraud involving financial institutions. (RR IV 28-29; RR VI 136-137). Dunn provided Johnson with copies of these five accounts, as well as copies of the warrants that had been deposited and the outgoing checks to Adejoke which were deposited at Citizen's Bank. (RR IV 31-32).

Once Johnson took over the investigation, he contacted various people in the State Comptroller's Office and began reviewing the Comptroller's records. (RR VI 138-139). He also reviewed records from Washington Mutual and Citizen's Bank. (RRVI 139-140). Having reviewing these records, Officer Johnson determined that he had a "major fraud case on [his] hands." (RR IV 140). After confirming that the treasury warrants were valid, Officer Johnson suspected that someone inside the Comptroller's Office was committing the fraud with the assistance of an accomplice "on the outside." (RR VI 141). Officer Johnson eventually discovered that appellant was the insider who was committing the fraud and Adejoke was the outside accomplice. (RR VI 141).

At the time of the fraud, George Tamayo was the manager of the Comptroller's Revenue Refunds Division. (RR IV 43-44). Tamayo explained that this division centralized the Comptroller's refund functions. (RR IV 45). He further explained that a taxpayer is entitled to a refund of taxes paid on gasoline under certain circumstances. (RR IV 45). For example, a refund is available if the gas was exported outside of Texas. (RR IV 45). A taxpayer seeking such a refund must submit a refund claim form in which he must verify he paid the state tax on the gas he purchased and that he transported it outside of Texas. (RR IV 47). Typically, the taxpayer must provide proof of exportation, such as a bill of loading. (RR IV 47). Once the Comptroller's Office receives a refund claim form, the form is directed to the Refund Claims Section where an individual examines the claim and the supporting documentation. (RR IV 48; State's exhibit 50). Depending on the sufficiency of the documentation, the examiner either approves or denies the tax refund request. (RR IV 49).

Appellant began working in the Comptroller's Office in 1995 and by 1999 he was an accounts examiner in the Refund Claims Section. (RR IV 57-58). In this position, appellant examined taxpayers' claims submitted for gas tax refunds. (RR IV 58). In order to determine whether the claims should be approved, appellant was required to first verify that the taxpayer actually had paid the gas in Texas. (RR IV 58). This function was typically accomplished by reviewing receipts, invoices, or any other paperwork that would confirm the gas had been purchased in Texas. (RR IV 58). Next, appellant was expected to confirm the relevant dates because a refund claim must be filed within one year from the date the gas was purchased or used. (RR IV58). Finally, if the refund claim was based on the taxpayer having exported the gas, appellant was required to verify, by proper documentation, that the gas had actually been exported. (RR IV 58-59). If appellant untimely approved a claim, a

treasury warrant would be mailed to the claimant. (RR IV 65). No one reviewed appellant's approval of these claims. (RR IV 85). His approval of a claim, alone, would the issuance of a warrant. (RR IV 85). In 1999, appellant processed about 57 percent of the gas tax refund claims and he processed about 97 percent of them in 2000. (RR     IV 70).

Tamayo also explained that if a first-time claimant submits a request for a refund on more than 1,000 gallons of gas, standard procedure would require appellant to send the claim to a field office from where an investigator would visit the claimant and confirm various aspects of the claim. (RR IV 59-63). The investigator would then send an account of his observations back to the accounts examiner. (RR IV 63). Whenever a field investigation is conducted, such information will be made part of the computer file for the taxpayer's claim.[Fn 3] (RR IV 63).

[Fn 3. Any information regarding a claim is maintained in the computer files, meaning one may access a claim on the Comptroller's computer system and view an imaged copy of the claim application, any documentation that was included by the taxpayer in support of his claim and any report from a field investigator. (RR IV 64).]

Tamayo noted that it is unusual for an individual to apply for a gas tax refund based on having exported gas out of Texas. (RR IV 68). Typically, wholesalers and retailers seek this type of refund, particularly when the amount of the refund exceeds $10,000. (RR IV 68-69).

Tamayo recalled that he received some information in August of 2000 concerning the validity of some of the warrants that had issued from his office. (RR IV 72). As a result, he researched a number of processed tax refunds and their accompanying documentation and found some claims that were inconsistent with claims the office typically approved. (RR IV 72-73). The suspicious refund claims were all for exported gasoline and the amount of gallons claimed was extremely large in each claim. (RR IV 75-76). None of the first-time claims were sent to a field investigator and there was no supporting documentation for the claims, which was very unusual. (RR IV 76). Another circumstance common to all of the suspicious claims was that appellant processed and approved them. (RR IV 75). Based on this collection of circumstances, Tamayo believed these claims were fraudulent.[Fn 4] (RR IV 77).

[Fn 4. The fraudulent claims were filed in the names of the following individuals: Dudley Haygood, Carl Mason, William Taylor, A. Durajaiye, John Parker, Rosanne James, Timothy Cornelson, James Linnstaedter, Falilatu Badmuss, William Stone, Lee Schnell, Francisco Sarrazola, Timothy Duff, Joseph Saranello, Donald Fehrenbach, Olu Adejoke, Semiu Badmus, Bryant Caldwell, Karen Samfilippo, Neil Swoyer, Robert Spain, B.A. Ashim, T.F. Amodayo, Carrie McDermott, Wen Qlang Gu, Charles Swamer, Shedrick Allen, and James Love. (RR IV 73-75).
The following members of the above list testified that they never filed a claim for a gas tax refund or received such a refund: John Parker (RR IV 36-41); Karen Sanfillipo (RR V 11-13); Joseph Saranello (RR V 16-17); Lee Schnell (RR V 25-27); Dudley Haygood (RR V 109-120); Francisco Sarrazola (RR V 135-141);

Robert Spain (RR VI 12-15); Timothy Cornelson (RR VI 17-18); James
Linnstaedter (RR VI 22-25); Carl Mason (RR VI 28); Bryant Caldwell (RR VI 31-
34); Donald Fehrenbach (RR VI 137-41); and Timothy Duff (RR VI 44-48).]

Tamayo described the specific irregular circumstances for each suspicious claim. For example, Tamayo testified that there were three refund claims filed under the name of B. A. Ashim. (RR IV 79-80). The Comptroller's Office received the first claim on August 10, 1999. (RR IV 80). The taxpayer, an individual, was seeking a tax refund on 47,715 gallons of gas based on the taxpayer's claim that the gas had been exported. (RR IV 81). Despite the fact that this was a first time claim, there was no documentation supporting the claim and appellant did not order a field investigation. (RR IV 80-86). Nevertheless, appellant approved this claim, resulting in a warrant for $9,352 being sent to the claimant. (RR IV 84-85; State's exhibit 5A). Tamayo explained that since this was a first-time claimant and the amount of the claim was substantial, a field investigation should have been ordered "without a doubt." (RR IV 85, 89-90).

Tamayo testified that the Comptroller's Office received a second gas tax refund from Ashim on November 4, 1999. (RR IV 87). The taxpayer was seeking a tax refund on 53,000 gallons of gas. (RR IV 87). According to Tamayo, it is highly unlikely that an individual would export this amount of gas. (RR IV 89). This claim was not supported by any documentation, such as invoices or receipts. (RR IV 87-88). Despite these unusual circumstances, appellant did not order a field investigation for this claim. (RR IV 89-90). Appellant approved the claim, resulting in a treasury warrant for $10,386 being issued to the claimant. (RR IV 97-98; State's exhibits 5A, 5B).

A third claim by Ashim was submitted on March 22, 2000. (RR IV 91; State's exhibit 5A). This claim was seeking a refund on 112,356 gallons of gas. (RR IV 91). Once he received this claim, appellant reduced the amount to 55,356 gallons. (RR IV 91). There is no documentation in the file explaining why appellant altered the amount of the claim. (RR IV 93). Tamayo explained that appellant's reduction is significant because the altered value is consistent with the number of gallons claimed in Ashim's first two claims. (RR IV 92). Tamayo then explained that when a subsequent claim is 50 percent larger than a previous claim, a field investigation must be conducted. (RR IV 92). In other words, appellant's undocumented reduction of the amount of gas claimed removed the claim from the category of claims that must be subjected to a field investigation. Although there is no supporting documentation for this claim, appellant approved it. (RR IV 93, 97). As a result, a treasury warrant for $10,848 was issued to [A]shim. (RR IV 97-98).

In similar fashion, Tamayo described dozens of gas tax refund claims that appellant approved without a field investigation despite the fact that such claims lacked the proper documentation. (RR V 44-87, 121-132, 143-189; RR VI 59-69). These claims were submitted under the following names: Olu Adejoke (RR V 44), Semiu

5

Badmus (RR V 79), Bryant Caldwell (RR V 126), Timothy Cornelson (RR V 130), Dudley Haygood (RR V 143), Timothy Duff (RR V 149), A. Durojane (RR V 152), Donald Feltrenbach (RR V 154), Wen Quang Gu (RR V 159), Rosanne James (RR V 160). James Linnstaedter (RR V 162), James Love (RR V 165), Karl Mason (RR V 167), Carrie McDermott (RR V 172), T. F. Omodayl (RR V 175), John Parker (RR V 178), Karen Samfillipo (RR V 181), Joseph Saranello (RR V 182), Francisco Sarrazola (RR V 186), Lee Schnell (RR V 187-188), Robert Spain (RR V 189), William Stone (RR VI 60), Charles Swamer (RR VI 62), Neil Swoyer (RR VI 64), and William Taylor (RR VI 66).

Once Officer Johnson reviewed these records of the Comptroller's Office, he obtained an arrest warrant for Adejoke. (RR VI 141-142). Adejoke fled town and, at the time of appellant's trial, he was still a fugitive. (RR VI 141, 168). Officer Johnson and a number of other officers then searched two addresses listed under Adejoke's name.

First, the officers went to the apartment number 2116 at 9707 South Gessner. (RR VI 142). The apartment was sparsely furnished which led Officer Johnson to believe the apartment was a phone drop, "which is someplace they have set up to receive phone messages and in case someone calls to verify something." (RR VI 144-145, 148). The officers found checkbooks, bank statements, bank deposit slips and mail in the names of various people. (RR VI 149). They also found a number of old credit reports. (RR VI 150). These discoveries were important because Officer Johnson believed that the theft committed by appellant and Adejoke likely involved their having taken over the identities of other people who had good credit ratings. (RR VI 145).

The officers also found a Texas driver's license in the apartment issued under the name of Joseph Saranello. (RR VI 151; State's exhibit 61). An officer called Saranello and learned that the photograph on the license was not that of Saranello. (RR VI 152). The officers also discovered a student loan application in which Adejoke listed appellant as a reference. (RR VI 153; State's exhibit 64).

George Alpacar, a Postal Inspector who participated in the search at 9707 South Gessner, found and opened an envelope which contained a check [and] a deposit slip. (RR VI 201-203). The check was written on a Washington Mutual account in the name of Timothy Duff and it was made payable to Adejoke. (RR VI 203).

Next, the officers conducted a search of Adejoke's two-bedroom town home located at 7102 Brendam. (RR VI 154). Officer Johnson found a letter from the State

6

Comptroller's Office addressed to Joseph Saranello in one of the bedrooms. (RR VI 163-164). The letter contained a treasury warrant. (RR VI 164). Officer Johnson also found a letter from the State Comptroller's Office addressed to Timothy Duff. (RR VI 164-165; State's exhibit 88). This letter confirms a gas tax refund of $36,061 to Duff. (RR VI 164-165; State's exhibit 88). Officer Johnson recognized Timothy Duff as one of the "takeover names" that had been used in furtherance of the criminal scheme he was investigating. (RR VI 165). Officer Johnson also found appellant's name and phone number in Adejoke's address book, thereby establishing a link between appellant and Adejoke. (RR VI 166). The officers also found a document in Adejoke's home which had a "Comptroller Document Locator number" on it, which indicated that the piece of paper had been imaged by the Comptroller's imaging system in Austin, Texas. (RR VI 60).

Another officer involved in the search of Adejoke's Brendam residence discovered a number of checkbooks on a closet shelf. (RR VI 207). The checkbooks were for accounts from Washington Mutual. (RR VI 208). The officer recognized a number of the named account holders as the victims of "identity takeover" in this case. (RRVI 208-209).

Bryan Vaclavik, a fraud examiner employed by the Harris County District Attorney's Office, participated in the search of Adejoke's Brendam address. (RR VII 76-79). Vaclavik identified the names on the check stocks found in the closet as "takeover names" of the following victims: Joseph Saranello, Lee Schnell, Francisco Sarrazola, Robert Spain, Bryant Caldwell, Donald Fehrenbach, James Linnstaedter, Timothy Duff and Timothy Cornelson. (RR VII 80). Each of these checking accounts carried the address of 9707 South Gessner, apartment 2116. (RR VII 80-81).

Vaclavik also identified other items discovered during the search of the Brendam address, including a Texas Comptroller's refund form exhibiting the name of Timothy Duff, an unnegotiated treasury warrant in the name of Badmus, a warrant receipt in the name of James Linnstaedter, a stub from one of the fraudulent treasury warrants issued to Adejoke, two envelopes from Washington Mutual addressed to Rosanne James and Charles Swamer, a Washington Mutual envelope addressed to Timothy Duff which contained a receipt for a deposit of $36,609, more Washington Mutual envelopes addressed to the various "takeover names," envelopes from the State Comptroller's Officer regarding warrants issued to the "takeover names," and handwritten notations containing personal information about the takeover victims. (RR VII 82-92).

A group of officers also executed a search warrant for appellant's residence located at 12317 Thompkins in Austin. (RR V 90-91; RR VI 179). One of the officers involved in the search, Sal Abreo, noticed that all the furniture and appliances in

7

appellant's home were new. (RR VI 186). He and the officers located $231,000 in cash in a bedroom.[Fn 5] (RR VI 192-195). A list of handwritten names was found on appellant's coffee table. (RR V 94-95; State's exhibit 54). The list contained a number of the "takeover names" such as James Linnstaedter, Timothy Cornelson, Robert Spain, Donald Fehrenbach, Bryant Caldwell, Karen Samfillipo, and Neil Swoyer. (RR V 95; State's exhibit 54). Another list contained Adejoke's name. (RR V 107). The officers also found a number of receipts reflecting appellant's cash purchases of thousands of dollars worth of merchandise and services. (RR VI 183-184; RR VII 17-22, 31-32). The officers found a cashier's check receipt for $41,000 from appellant to a title company. (RR VI 184). Finally, the officers found a safe deposit box key in appellant's home that fit Adejoke's safe deposit box at Citizen's National Bank in Houston. (RR VII 28-29, 159-60).

[Fn 5. Appellant's salary was about $31,000 per year. (RR VI 80).]

Bryan Valclavik, the fraud examiner, obtained copies of the fraudulently issued treasury warrants and, by examining the back of the documents, he determined into which bank the warrants had been deposited. (RR VII 94-95). He also attempted to trace the paths of the funds after they were deposited. (RR VII 95). Vaclavik detected a scheme in which the warrants issued under the takeover names were initially deposited into a bank checking account set up in the takeover name corresponding to the name on the warrant. (RR VII 148). Then the funds would be withdrawn from this account or a check would be written to Adejoke and deposited into his personal bank account. (RR VII 148). Vaclavik provided a lengthy and detailed explanation, supported by the appropriate documentary evidence, of how Adejoke and appellant perpetuated this scheme by fraudulently using the names of the following "identity takeover" victims: Saranello, Duff, Schnell, Sarrazola, Taylor,
Fehrenbach, Linnstaedter, Cornelson, Spain, Caldwell, Samfillipo, James, Parker and Gu. (RR VII 124-148). Vaclavik concluded that almost two million dollars worth of treasury warrants were fraudulently issued under these and other takeover names. (RR VII 147).

*Ololade v. State*, No. 10-01-00255-CR, State Appellate Brief, at 1-12, *filed* June 13, 2002.

## II. Procedural History

A jury convicted Ololade and sentenced him to twenty-seven years in prison. *State v. Ololade,* No. 870145 (262nd Dist. Ct., Harris County, Tex., Mar. 30, 2001). The Tenth Court of Appeals affirmed Ololade's conviction on October 30, 2002. *Ololade v. State*, No. 10-01-255-CR.

the Texas Court of Criminal Appeals refused his petition for discretionary review on April 2, 2003. *Ololade v. State*, No. 123-03. *See also* Texas Court of Criminal Appeals Website, (http://www.cca.courts.state.tx.us/).

Ololade filed two state applications for writs of habeas corpus; both were dismissed because they were filed while Ololade's direct appeal was still pending. *Ex parte Ololade*, No. 53,047-01 (Tex. Crim. App. Sept. 11, 2002); *Ex parte Ololade*, No. 53,047-02 (Tex. Crim. App. Jul. 30, 2003). *See* (http://www.cca.courts.state.tx.us/). Ololade filed a third application on August 15, 2003, which the Court of Criminal Appeals denied without a written order. *Ex parte Ololade*, No. 53,047-04, at cover, 2 (Tex. Crim. App. Mar. 10, 2004). The pending action was filed on June 3, 2004.

### III. Claims

Ololade asserts the following claims:

1. Ololade was denied effective assistance of counsel because his attorney failed to:

    a. Conduct an independent investigation;

    b. Adequately review the State's file;

    c. Interview the State's witnesses;

    d. Subpoena witnesses;

    e. "Force" the State to relinquish seized evidence;

    f. File crucial motions; and

    g. Offer any evidence or defense.

2. The trial court erred in denying a motion to suppress evidence that was obtained through an unconstitutional search and seizure.
3. The trial court abused its discretion by exempting a State's witness from "the Rule."

    4.       The trial court lacked jurisdiction over Ololade in Harris County; proper venue was in Travis County, Ololade's county of residence.

    5.       The State violated the *Brady* rule by failing to disclose during the trial that evidence which had been seized from Ololade was missing when they attempted to retrieve it for trial.

## IV. The Applicable Legal Standards

This petition is governed by applicable provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The intent of the AEDPA is to prevent federal habeas "retrials" and to ensure that state-court convictions are given effect to the extent possible under the law, *Bell v. Cone*, 122 S.Ct. 1843, 1849 (2002), by limiting the scope of collateral review and raising the standard for federal habeas relief. *Robertson v. Cain*, 324 F.3d 297, 306 (5th Cir. 2003).

Under the AEDPA, federal relief cannot be granted on claims adjudicated on the merits in state court unless the state adjudication was (1) contrary to clearly established federal law as determined by the Supreme Court, or (2) involved an unreasonable application of clearly established federal law as determined by the Supreme Court. *Williams v. Taylor,* 120 S.Ct. 1495, 1519 (2000), *citing* 28 U.S.C. §§ 2254(d)(1) and (2). A state court decision is contrary to federal precedent if it applies a rule that contradicts the governing law set forth by the Supreme Court or if it confronts a set of facts that are materially indistinguishable from a Supreme Court decision and arrives at a result different from the Court's precedent. *Early v. Packer*, 123 S.Ct. 362, 365 (2002). A state court unreasonably applies Supreme Court precedent if it unreasonably applies the correct legal rule to the facts of a particular case, or unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams,* 120 S.Ct. at 1520, 1523. In deciding whether a

state court's application was unreasonable, this court considers whether the application was objectively unreasonable. *Id.* at 1521

The AEDPA affords deference to a state court's resolution of factual issues. Under 28 U.S.C. § 2254(d)(2), a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless it is objectively unreasonable in light of the evidence presented in the state-court proceeding. *Miller-El v. Cockrell*, 123 S.Ct. 1029, 1041 (2003). A federal habeas court must presume the underlying factual determination of the state court to be correct, unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Miller-El*, 123 S.Ct. at 1036.

These standards will be applied to the pending summary judgment motion.

## IV. Analysis

### A. Ineffective Assistance of Counsel

In his first claim, Ololade contends that he was denied effective assistance of counsel because he failed to: (a) conduct an independent investigation, (b) adequately review the State's file, (c) interview State's witnesses, (d) subpoena witnesses, (e) "force" the State to produce the evidence seized in a search of Ololade's residence, (f) file crucial motions, and (g) offer any evidence or defense. The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel. U.S. CONST. amend. VI. A federal habeas corpus petitioner's claim that he was denied effective assistance of counsel is measured by the standards set out in *Strickland v. Washington*, 104 S.Ct. 2052 (1984). To assert a successful ineffectiveness claim, a petitioner must establish both constitutionally deficient performance by counsel and actual prejudice as a result of counsel's deficient performance. *Id.* at 2064. The failure to demonstrate

11

either deficient performance or actual prejudice is fatal to an ineffective assistance claim. *Green v. Johnson*, 160 F.3d 1029, 1035 (5th Cir. 1998).

A counsel's performance is deficient if it falls below an objective standard of reasonableness. *Strickland*, 104 S.Ct. at 2064. In determining whether counsel's performance was deficient, judicial scrutiny must be highly deferential, with a strong presumption in favor of finding that trial counsel rendered adequate assistance and that the challenged conduct was the product of a reasoned trial strategy. *West v. Johnson*, 92 F.3d 1385, 1400 (5th Cir. 1996). To overcome this presumption, a petitioner must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992). However, a mere error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. *Strickland,* 104 S.Ct. at 2066. Actual prejudice from a deficiency is shown if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 2068. To determine prejudice, the question focuses on whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. *Lockhart v. Fretwell*, 113 S.Ct. 838, 844 (1993). In that regard, unreliability or unfairness does not result if the ineffectiveness does not deprive the defendant of any substantive or procedural right to which he is entitled. *Id.*

In reviewing an ineffective assistance of counsel claim under the AEDPA, the test is not whether the petitioner has made a showing under *Strickland*, but whether the state court's decision that the petitioner did not make a *Strickland* showing was contrary to or an unreasonable application

of the standards under federal law regarding ineffective assistance of counsel. *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003).

Ololade alleges that his attorney failed to investigate his case by neglecting to collect evidence in his behalf. *See* Docket Entry No. 1, at 20. In order to prevail on an allegation that his attorney failed to adequately investigate the case, Ololade must show what the investigation would have revealed and how it would have helped his defense. *See Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002); *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989). Defense counsel are afforded great deference with regard to how they conduct their investigations. *Green*, at 1003. Such allegations are not favored in federal habeas proceedings because they call for speculation on what the purported results would have yielded. *Evans*, at 377.

Ololade's allegations regarding the investigation do not point to any specific evidence that his attorney would have found had he conducted additional investigation. Such allegations are conclusory and do not raise a constitutional issue in a federal habeas proceeding. *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000), *citing Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983). The petitioner cannot prevail unless he can show how the attorney's alleged errors and omissions were deficient and thereby prejudiced the petitioner's right to a fair trial. *Id.*, *citing Barnard v. Collins*, 958 F.2d 634, 642 (5th Cir.1992).

Ololade's allegation regarding his attorney's failure to investigate the State's file is insupportable also. He fails to allege what additional information would have been discovered and how the outcome of the trial would have been altered. The state courts' rejection of the claim regarding the alleged failure to investigate the State's file was not contrary to or an unreasonable

13

application of the standards under federal law regarding ineffective assistance of counsel. *See Schaetzle*, 343 F.3d at 440.

Ololade claims that his attorney failed to subpoena witnesses. He specifically alleges that his attorney could have subpoenaed Niyi Oyenekin who was found at the apartment leased to Adejoke. *See* Docket Entry No. 1, at 20. Ololade contends that Oyenekin[1] would have testified that she did not know Ololade and that he was not a friend or associate of Adejoke. *Id*. Ololade fails to submit any evidence in support of this allegation nor does he show how failing to call Oyenekin amounted to deficient performance or that the absence of Oyenekin's testimony prejudiced the outcome of the trial. Consequently, Ololade's speculative allegation regarding an uncalled witness is subject to dismissal. *See Evans*, 285 F.3d at 377; *United States v. Cockrell*, 720 F.2d 1423, 1427 (5th Cir. 1983).

Ololade contends that his attorney was ineffective by failing to "force" the State to produce the evidence (money and jewelry) seized during the search of his residence. This claim was not presented on direct appeal, and Ololade's state habeas application (No. 53,047-04, at 08) does not allege any facts indicating that his attorney was ineffective for failing to seek production of the missing evidence. Consequently, this claim is not subject to review because the facts have not been adequately presented to the Court of Criminal Appeals. *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998). Ololade is barred from filing another state habeas application in the Texas courts challenging the conviction in this proceeding. *See* TEX. CODE CRIM. PRO. art. 11.07 § 4 (Vernon

---

[1] Sergeant Billy Johnson of the Houston Police Department gave testimony concerning a search of Adejoke's apartment. Volume 6 Trial Court Statement of Facts 136-150. He identified Niyi Oyenekan [Oyenekin] as being present at the apartment and giving consent to search the premises. *Id*.

2005).  *Horsley v. Johnson*, 197 F.3d 134, 136 (5th Cir. 1999).  *See also*, *Emery v. Johnson*, 139 F.3d 191, 195-196 (5th Cir. 1997).  Further, there is no indication that production of the purported missing evidence would have altered the outcome of the trial or that his attorney was deficient in not seeking production of the evidence.  As Ololade has shown (*See* Docket Entry No. 1, Exhibit C, Newspaper Article), the missing items were recovered.  Ololade has not shown that the missing money and jewelry were exculpatory.  On the contrary the items were inculpatory.  Consequently, this claim is subject to dismissal.  *United States ex rel. Partee v. Lane,* 926 F.2d 694, 701 (7th Cir. 1991) ("a habeas court cannot even begin to apply *Strickland's* standards to such a claim unless and until the petitioner makes a 'specific, affirmative showing as to what the missing evidence or testimony would have been.'"), *quoting United States ex rel. McCall v. O'Grady*, 908 F.2d 170, 173 (7th Cir. 1990).

Ololade generally alleges that his counsel failed to file "crucial" motions and that he failed to offer any evidence or defense.  However, Ololade does not specify what kind of motions should have been filed or whether they would have been granted; nor does he identify any evidence or defense which would have resulted in a different result at trial.  Consequently these claims must be dismissed.  *Miller*, 200 F.3d at 282; *Ross*, 694 F.2d at 1012.

Ololade has not shown that the State courts' rejection of the ineffective assistance of counsel claim was not contrary to or an unreasonable application of constitutional law as clearly established by the Supreme Court.  Nor was the decision an unreasonable determination of the facts.  Therefore, the ineffective assistance of counsel claim will be **DENIED**.

B. Search and Seizure

Ololade contends that the trial court erred when it denied his motion to suppress evidence found in his home and his vehicle pursuant to a search warrant. The Supreme Court has unequivocally stated that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 96 S.Ct. 3037, 3040 (1976) (footnote omitted). "[A] federal court need not apply the exclusionary rule on habeas review of a Fourth Amendment claim absent a showing that the state prisoner was denied an opportunity for a full and fair litigation of that claim at trial and on direct review." *Id.* at n.37. It is the existence of state processes allowing an opportunity for full and fair litigation of Fourth Amendment claims, rather than a defendant's use of those processes, that serves the policies underlying the exclusionary rule and bars federal habeas corpus consideration of claims under *Stone*. *See Williams v. Brown*, 609 F.2d 216, 220 (5th Cir. 1980) (holding that "in the absence of allegations that the processes provided by a state to fully and fairly litigate fourth amendment claims are routinely or systematically applied in such a way as to prevent the actual litigation of fourth amendment claims on their merits," *Stone* bars the litigation of Fourth Amendment claims); *Caver v. State of Alabama*, 577 F.2d 1188, 1192-93 (5th Cir. 1978) (finding that "*Stone v. Powell* precludes federal habeas corpus consideration of those issues whether or not the defendant avails himself of that opportunity").

Here, Texas provided Ololade an adequate opportunity to challenge the adequacy of the warrant. After holding a hearing, the trial court denied a motion to suppress the seized evidence. As Texas fulfilled its obligation to provide Ololade the opportunity to challenge the constitutionality

16

of the search and seizure, *Stone v. Powell* prohibits this Court from reconsidering the issue on federal habeas review. This claim will be **DENIED**.

### C. "The Rule"

Ololade complains that the trial court abused its discretion by exempting Bryan Vaclavik, an investigator, from the rule of witnesses. As the narrative in section I of this Memorandum has indicated, the scheme behind the offense was complex and the criminal investigation was lengthy. In such cases, the trial court has the discretion to allow investigators to remain present during the proceedings. *See United States v. Green,* 293 F.3d 886, 892 (5th Cir. 2002). Moreover, failure to separate or sequester witnesses outside of the courtroom does not raise due process implications. *Bell v. Duckworth*, 861 F.2d 169, 170 (7th Cir. 1988). At the most, Ololade has raised a state law claim which is not subject to review in this proceeding. *Weeks v. Scott*, 55 F.3d 1059, 1063 (5th Cir. 1995). Therefore, the claim regarding failure to exclude a witness will be **DENIED**.

### D. Venue

Ololade contends that he should have been tried in Travis County, his place of employment and residence, rather than Harris County. However, jurisdiction and venue was proper in Harris County because that is where part of the theft took place. TEX. CODE CRIM. PRO. art. 13.08; *Jones v. State*, 979 S.W.2d 652, 657 (Tex. Crim. App. 1998). The Sixth Amendment right to trial in the district where the defendant committed the crime does not apply to state prosecutions. *Cook v. Morrill*, 783 F.2d 593, 595 (5th Cir. 1986), *citing Martin v. Beto* 397 F.2d 741, 748 (5th Cir.1968); *see also Stevenson v. Lewis*, 384 F.3d 1069, 1072 (9th Cir. 2004) (under California law when a crime is committed in two counties, the defendant can be tried in either county). Ololade cannot prevail

on a claim of venue regarding state law because AEDPA only authorizes habeas relief arising from claims involving the "Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). This claim will be **DENIED**.

### E. *Brady* Claim

Ololade complains that the prosecutor withheld evidence in violation of *Brady v. Maryland*, 83 S.Ct. 1194, 1196-97 (1963). He states that $ 230,000.00 in cash and jewelry which was seized from his residence was stolen from the Texas Department of Public Safety Property Room by a custodian, Tommy Wayne Arp. *See* Petition, (Docket Entry No. 1) at 10, Newspaper Article, Exhibit C. Ololade contends that the State violated *Brady* when it failed to convey that it had discovered that the evidence had been stolen before the trial and that the evidence could not be retrieved during the trial. The money and jewelry were later discovered at Arp's house. *See* Exhibit C.

"[T]o state a *Brady* claim, a defendant must demonstrate that (1) the prosecution suppressed evidence, (2) the evidence was favorable, (3) the evidence was material to either guilt or punishment, and (4) discovery of the allegedly favorable evidence was not the result of a lack of due diligence." *Rector v. Johnson*, 120 F.3d 551, 558 (5th Cir. 1997). "Evidence is 'material' if there is a reasonable probability that, had the evidence been disclosed, the result at the trial would have been different; a reasonable probability is one that undermines confidence in the outcome of the trial." *Summers v. Dretke*, 431 F.3d 861, 878 (5th Cir. 2005), *quoting Duncan v. Cain*, 278 F.3d 537, 539-40 (5th Cir.2002), *citing United States v. Bagley*, 105 S.Ct. 3375 (1985). It is the petitioner's burden to show that the withheld evidence could have reasonably cast the case in a different light

to the extent that confidence in the outcome would be undermined. *Rector*, 120 F.3d at 562. Furthermore, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Id. citing United States v. Agurs*, 96 S.Ct. 2392, 2400 (1976).

In this action, the jewelry and cash were not admitted at trial. The absence of the evidence helped, not harmed, Ololade's defense. Had the missing items had been produced, the evidence would have only supported the conclusion that Ololade, whose annual salary was $ 31,000 (*See* n.5 *supra*) was guilty of theft. The state court's rejection of the *Brady* claim was not contrary to or an unreasonable application of constitutional law as clearly established by the Supreme Court. Nor was the decision an unreasonable determination of the facts. Therefore, the claim will be **DENIED**.

Therefore, Ololade is not entitled to federal habeas relief, and his petition for a writ of habeas corpus is **DISMISSED**.

## V. Certificate of Appealability

Under 28 U.S.C. § 2253, Ololade needs to obtain a Certificate of Appealability before he can appeal this Memorandum and Order dismissing his petition. To obtain a Certificate of Appealability, Ololade must make a substantial showing of the denial of a constitutional right. *Williams v. Puckett*, 283 F.3d 272, 276 (5th Cir. 2002). To make such a showing, Ololade must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues in a different manner; or that the questions are adequate to deserve encouragement to proceed further. *Lucas v. Johnson*, 132 F.3d 1069, 1073 (5th Cir. 1998). For the reasons stated in this Memorandum Opinion and Order, Ololade has not made a substantial showing of the denial of a

constitutional right. *Newby v. Johnson*, 81 F.3d 567, 569 (5th Cir. 1996). The Court **DENIES** the issuance of a Certificate of Appealability in this action.

## VI. Conclusion

The Court **ORDERS** the following:

1. Respondent's Motion for Extensions of Time (Docket Entry No. 9) is **GRANTED**.

2. Respondent's Motion for Summary Judgment (Docket Entry No. 10) is **GRANTED**.

3. This action is **DISMISSED**, with prejudice.

4. A Certificate of Appealability is **DENIED**.

**SIGNED** on this 29th day of March, 2006.

_____
JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE